UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK

_____

MICHELLE GLOVER,

                              Plaintiff

-vs-

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                              Defendant.

_____

DECISION AND ORDER

10-CV-6392 CJS

APPEARANCES

For the Plaintiff:          Kenneth R. Hiller, Esq.
                           Ida Comerford, Esq.
                           Law Offices of Kenneth Hiller
                           6000 North Bailey Avenue, Suite 1A
                           Amherst, New York 14226

For the Defendant:         Jane B. Wolfe, A.U.S.A.
                           Kathryn L. Smith, A.U.S.A.
                           John J. Field, A.U.S.A.
                           United States Attorney's Office
                           100 State Street, Room 500
                           Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Michelle Glover ("Plaintiff") for supplemental security

income ("SSI") disability benefits.  Now before the Court is Defendant's motion [#5] for

judgment on the pleadings and Plaintiff's cross-motion [#7] for judgment on the

pleadings.  For the reasons that follow, Plaintiff's motion  is granted, Defendant's motion

1

is denied, and this matter is remanded for further administrative proceedings.

## PROCEDURAL HISTORY

The procedural history of this action was accurately set forth in Defendant's brief as follows: "Plaintiff protectively filed for SSI benefits on December 27, 2006, and was denied (T. 11, 38-41, 88-91, 121).[1] A hearing before administrative law judge (ALJ) Wallace Tannenbaum was held on July 23, 2009 (T. 19-37, 42).  On August 10, 2009, the ALJ issued a decision denying Plaintiff's claim (T. 8-18). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on November 20, 2009 (T. 1-7, 85-86)." Def. Memo of Law [#5-1] at 1-2.

## VOCATIONAL HISTORY

Plaintiff was thirty-six years old at the time of the hearing before the ALJ. (22). Plaintiff had earned a GED diploma and completed at least two years of college. (36) She also earned an associate's degree or certificate in medical transcription after the onset of her alleged disability. (355)  Plaintiff has worked as "[an] assembly line worker, cashier, cook and telemarket[er]." (56)  Plaintiff's earning history, covering the years 1988 to 2009, indicates that she had income of $13,000.00, $16,000.00, and $14,000.00, in 1996, 1997, and 1998, respectively. (92)  In several other years, she earned only a few thousand dollars or less.  (*Id*.)  She has no reported income for the following years: 1993, 2001-2003, and 2006-2009.  In 2002, Plaintiff applied for Social Security Disability, for unspecified reasons, and was denied. (123)  In 1995, Plaintiff

---

[1] Unless otherwise noted, all citations are to pages of the administrative record.

worked as a grocery store cashier. (103).  This work required her to stand primarily, and

to lift less than ten pounds. (130)  Between 1995 and 1998, she worked on an assembly

line making cameras. (Id.).  This work required her to sit and stand twelve hours per day,

and to frequently lift 25 pounds, and occasionally up to 50 pounds. (104, 129)  On June

25, 1998, Plaintiff injured her shoulder while working on the camera assembly line. (56)

The following year, she earned slightly less than $4,000.00 doing unspecified work. (92)

In 2004 Plaintiff earned approximately $800 working part-time as a telemarketer, which

required her to sit and lift less than ten pounds. (24, 92, 103, 132)   In 2005, Plaintiff

earned approximately $300 doing unspecified work. (92)

Since 1998, Plaintiff has claimed to be unable to work due to a variety of ailments

including pain in her neck, back, shoulders, and wrists, as well as migraine headaches,

asthma, and depression. (56)  As noted above, in 2004 Plaintiff worked briefly as

telemarketer part time, which involved sitting at a desk and making telephone calls. (24)

Plaintiff stated that such part-time work bothered her neck, back, and wrists, and that she

had to stand up and walk frequently because she could not sit for long periods of time.

(34)[2]

ACTIVITIES OF DAILY LIVING

At the hearing before the ALJ, Plaintiff testified that she has "chronic pain,"

involving both shoulders and wrists, "cervical spasms" in her neck, and "lower back

spasms." (24-25)  Plaintiff testified that her oldest child, who is fifteen years old, performs

cooking and cleaning, while Plaintiff supervises her. (28)  Plaintiff indicated that the only

---

[2]Plaintiff's representative maintained that Plaintiff was fired from this job because she could not sit
and hold her head in one position. (58)

cooking she performs is with a microwave oven. (Id.)  Plaintiff testified that she is able to drive.  Plaintiff indicated that she socializes with family and friends and listens to the radio. (Id.)  Plaintiff stated that she can only lift "three to four pounds," and that she cannot lift a gallon of milk. (30)[3]  Plaintiff further stated that she sees her children off to school in the morning, and takes a three-hour nap most days, because her medications make her feel tired. (32-33)  In a Social Security Administration form, Plaintiff described her daily activities as follows:  "Get the kids off to school.  Go to therapy pool, acupuncture.  Come home, sleep until kids get home.  Make microwave food and help as much with homework. [sic]  Go back to sleep." (140)  Plaintiff testified that she feels depressed because there are many things she can no longer do. (35)

## MEDICAL EVIDENCE

Plaintiff's medical history was summarized in the parties' submissions and need not be repeated here in its entirety.  It is sufficient for purposes of this Decision and Order to note the following facts.  Plaintiff's medical problems include surgery on both shoulders for impingement problems, carpal tunnel syndrome, back and neck pain, migraine headaches, asthma, and depression.  Plaintiff's primary care doctor, Geoffrey Williams, M.D. ("Williams"), has prescribed a wide variety of medications for Plaintiff, including Vicodin, Oxycontin, Zolof, Flexeril, and Celebrex. (117)

In February 2002, Allen Pettee, M.D. ("Pettee") performed neurologic testing, which was essentially normal, except for mild neurologic abnormality due to carpal tunnel syndrome.  Pettee indicated that Plaintiff was complaining of numbness, tingling, and

---

[3]As discussed further below, a few months prior to the hearing, Plaintiff told her doctor that she could lift up to ten pounds. (265).

pain in her hands. (192)  Pettee reported that his testing showed only mild carpal tunnel syndrome, which did not suggest any need for urgent surgical intervention. (194)  Pettee further observed that an MRI performed in April 2000 showed no radiculopathy in the cervical spine. (192)  In April 2002, Pettee performed further testing and found that Plaintiff's condition was unchanged. (195-196)  At that time, Pettee observed that Plaintiff had full strength and full hand and arm power. (195)  Regarding Plaintiff's complaint of neck pain, Pettee indicated that Plaintiff had "cervicogenic pain [which was] not discogenic in nature." (197)

On July 1, 2002, Robert Little, Jr., M.D. ("Little"), a treating othopedist, stated, in connection with a worker's compensation claim,  that Plaintiff had 22.5% loss of use of her right arm/shoulder. (199)

On May 12, 2003, Michael Kuttner, Ph.D. ("Kuttner") gave Plaintiff a Behavioral Medicine Evaluation, for purposes of pain management. (200-202)  Plaintiff told Kuttner that she experienced daily constant pain down the back of her head and spine.  Kuttner observed that Plaintiff was "quite irritable" and "displayed a great deal of pain behavior." (200)  Kuttner indicated  that Plaintiff was "more somaticalll/illness focused" and "slightly more depressed" than most patients.  Kuttern stated that Plaintiff appeared to fall within a "dysfunctional subgroup" of patients, who

> have difficulty in managing their pain due to a higher than normal fear of the effects of activity on inducing pain and a lower than normal expectation of their ability to manage those pain effects.  She reports high levels of pain severity, but moderate amounts of interference from  that pain in her life. She reports a low level  of sense control over life events and a low level of affective distress.  She reports moderate social supports.  She reports low levels of punitive responses from her environment, and obtains a great deal of reinforcement for pain behavior.  She reports engaging in a great deal of distraction and a moderately high level of general activity.

(201).  Kuttner concluded that Plaintiff could benefit from relaxation training with biofeedback, sensory alteration techniques, and cognitive therapy to reduce her somatic preoccupation with her pain and related depression. (201)

On May 4, 2006, Plaintiff had MRI testing on her cervical spine and lumbar spine. (157-158).  The cervical spine MRI was normal. (157).  The lumbar spine MRI showed mild degenerative disc disease at L5-S1, with a small disc bulge, and no evidence of spinal stenosis or significant foraminal narrowing. (158).

On or about September 5, 2006, Williams completed a report indicating that Plaintiff had the following problems: bilateral carpal tunnel, ceviogenia [sic] neck and shoulder pain, repetitive motor disorder of the right upper extremity, right rotator cuff tear, major depression, GERD, asthma, and migraine headaches. (161)  Williams stated that Plaintiff could sit for sixty minutes at a time and stand for fifteen minutes, and that she had no mental limitations. (161)  Williams further stated that Plaintiff had the following physical limitations: no repetitive motions with hands/arms, no use of arms/hands above her head, and no lifting over ten pounds. (162).

On March 23 2007, Plaintiff was given a psychiatric evaluation by consultative examiner Christine Ransom, Ph.D. ("Ransom").  Plaintiff reportedly told Ransom that her depression was somewhat improved on medication, but that she frequently experienced crying, irritability and low engergy. (163-164)  Plaintiff's affect was moderately depressed, but her attention and concentration, memory, and cognitive functioning were all good. (165)  Ransom indicated that Plaintiff's depression prognosis was "fair to good with more intensive treatment." (166)  Ransom stated that Plaintiff could follow simple instructions, perform simple tasks independently, maintain concentration and attention for simple

tasks, learn new tasks, and maintain a "simple regular schedule," but would have "moderate difficulty" performing complex tasks and dealing with stress. (165)

On March 23, 2007, Plaintiff was examined by internist Brij Sinha, M.D. ("Sinha"), a consultative examiner. (167-171)  Pulmonary function testing showed a "very severe restriction." (169)  Overwise, though, Sinha's exam was essentially normal.  For example, Sinha reported the following: no cervical spine spasm or pain, full flexion and rotary movement in lumbar spine, negative straight leg raising test, full range of movement in left shoulder, full strength in upper and lower extremities, and full grip strength and dexterity in hands bilaterally. (169-170)   Sinha concluded that Plaintiff had mild to moderate restriction on heavy lifting and use of shoulders and neck, with no other limitations except avoiding respiratory irritants. (170)

On March 27, 2007, Williams saw Plaintiff for a "workers comp visit." (226-227) Plaintiff reportedly told Williams that her pain was "8 out of 10 in her neck, and 7 out of 10 in her lower back." (226)  Williams stated that Plaintiff had "3+ grip strength" in her right hand and "4/5 grip strength" in her left hand.  Williams further reported that her "straight leg raise is 45 degrees on the right and 50 degrees on the left." (226).  Williams renewed Plaintiff's prescription for hydrocodone acetaminophen. (Id.)  The same day, Williams completed a residual functional capacity assessment report. (211-222)  In that regard, Williams indicated that Plaintiff's symptoms were "unchanged over past 5 years." (212)  Williams left most of the form report blank, although he noted that Plaintiff was "tearful throughout today's visit - citing tension over continued review of her [disability] case." (217)  Williams further stated: "The patient has had no changes in work related restrictions.  I consider her condition permanent at this point." (221)

7

On May 1, 2007, a Social Security Administration medical consultant, M. Apacible ("Apacible"), completed a Psychiatric Review Technique form, which indicated that Plaintiff would have moderate difficulty in performing complex tasks and dealing with stress," but that she could follow and understand simple directions and perform simple tasks. (246)  Apacible also noted that Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace. (245).  Overall, though, Apacible stated that Plaintiff's "psychiatric difficulties do not prevent work in which she would have simple tasks." (246)

On May 8, 2007, Williams completed one of his most extensive office notes describing Plaintiff's condition.  He stated:

> SUBJECTIVE: Dating back to 6-25-98, she developed pain in the back of her head particularly left side which moves up the scalp and is become chronic.  She reports a 3 out of 10 consistent pain in that area.  The relief that she gets this [sic] from Vicodin Skelaxin.  At time when she uses those medications her pain can go down to a two out of 10.  She reports that she always has this pain even when at rest since the date of her injury.  She does report that when she stands or [is] under stress that this makes her cervalgia pain worse.  She has had a side effect of Flexeril and is unable to take it because of diarrhea that occurs with its use.  She reports that all days are bad.  She needs to use and [sic] narcotic Vicodin every day to manage this pain.  And there is no period of time in which she can be comfortable at work with this level of discomfort.
>
> Objective:  Her exam is consistent with previous exams.  She is tender over the trapezius as it inserts into the back of her head on both sides and down to both shoulders.  There is no swelling redness or physical changes that I can observe.
>
> ***
>
> I feel because of the constant need for the narcotics and the worsening under tension situations at work, that she is unemployable because of this.  She has tried to work on various phone lines since developing this injury

but has been unsuccessful even and [sic] as little as 3 to 4 days of working
4 hours per day.

(280)

On May 8, 2007, Williams completed a headache residual functional capacity

questionnaire, in which he concluded that based on Plaintiff's subjective complaints, she

suffers from two types of headaches – migraine headaches and cervicogenic headaches,

with the latter producing constant pain. (256).  As for frequency, Williams stated that "all

days are bad," and added:  "I don't believe that she will be able to work because of the

pain she is in." (259).  When asked what tests he conducted, Williams wrote:  "No

additional tests are available to  assess pain as this is subjective." (261)

On August 10, 2007, following an office visit by Plaintiff, Williams wrote: "Her

symptoms remain the same.  These have been stable now for over 10 years.  I have

again completed the forms related to her disability.  She still is not to lift above her head

nor lift greater tan 10  pounds." (277)  On September 25, 2007, Williams reported that

Plaintiff complained of "nine out of ten" pain when she did not take her medication. (271)

He stated: "She reports stinging sharp pain that goes up her neck from her left shoulder

and down her arms. [S]he at times can also get pain down into her right arm." (Id.)

Williams did not conduct any testing, stating: "As all of her symptoms are subjective and

have not changed in pattern or severity no additional exam is done today." (Id.)  On

October 25, 2007, Williams reported that Plaintiff was requesting another prescription of

Vicodin, which he provided. (268)  Williams observed that Plaintiff's neck was "tender,"

but had a full range of motion. (Id.)

On January 11, 2008, during an office visit, Plaintiff told Williams that her neck

pain was "9 out of 10" without narcotic pain relievers, and that with medication it was "4 to 5." (265)  Plaintiff also told Williams that she was able to lift her new baby, which reportedly weighed ten pounds. (Id.) ("Her baby weighs approximately 10 pounds in right [sic] and this weight is about as much as she can manage lifting without increasing discomfort.")  On February 14, 2008, Williams saw Plaintiff, at which time she asked to be placed back on oxycontin.  In that regard, she stated that she was still experiencing "8 out of 10 pain in her neck." (263)   Williams "explained the difficulty with narcotics and accommodation to current dosing," and placed Plaintiff back on oxycontin, because he felt that twice a day dosing would be easier for her to manage. (Id.)

On February 22, 2008, Williams completed a residual functional capacity assessment form for Plaintiff's social security representative. (292-295)  Most of the form is left blank.  Williams indicated that Plaintiff's condition was "cervicalgia chronic neck pain," which produced symptoms of shoulder pain, neck pain, wrist pain/numbness, and depression. (292)  Williams stated that Plaintiff could not lift more than ten pounds, could not lift above the shoulders, and could not lift repetitively. (Id.)  Williams indicated that Plaintiff's pain would "constantly" interfere with her attention and concentration at work. (293)  However, when asked to quantify Plaintiff's ability to do certain things, such as sit or stand, Williams wrote: "I defer to specialist [illegible]." (Id.)

On March 6, 2008, Williams reported that Plaintiff was experiencing less pain after switching from hydrocodone to Oxycontin: "She finds that her pain is almost resolved on this new medication regimen.  Infrequently has she ever reported that the pain has fallen below even a 4-5 level with her previous pain treatment regimen." (338)  Williams further indicated that he considered Plaintiff "partially disabled": "The patient's pain complaints

have been stable for many years she has a permanent partial disability." (Id.)  Williams also stated that he had "negotiated" with Plaintiff concerning her pain medication: "I've negotiated with her that she will remain on this pain medication regimen over the long term and that I expected [sic] eventually she will start experiencing more pain and she [sic] accommodates to this dose I recommend that the medication does not be increased." [sic] (Id.)

In or about July 2008, Plaintiff switched from seeing Williams to seeing Stephen Judge, M.D. ("Judge").   On July 18, 2008, Judge saw Plaintiff for the first time ("This is my first visit with Michelle"), and noted that she complained of tenderness in her right wrist, and tenderness in both shoulders, with marked decreased range of motion in the right shoulder. (298)  Referring to Williams's treatment, Judge stated:  "It sounds as though the basic approach has been one of pain control." (Id.)  On August 18, 2008, one month into the treatment relationship, Judge completed a residual functional capacity assessment form for Plaintiff. (301-302)  Judge reported that Plaintiff was "very limited" in her ability to stand, and "moderately" limited in her ability to sit and walk, but he did not explain why. (301)  When asked to describe which work activities were contraindicated, Judge wrote: "Unchanged.  Minimal use of arms/hands – very limited in any repetitive motion of upper extremities." (302)

On September 24, 2008, Michael Stanton, M.D. ("Stanton") performed nerve conduction testing on Plaintiff, at Judge's request. (310-311)  Specifically, such testing was in response to Plaintiff's continued complaints of tingling, numbness, and swelling in her hands.  Upon examination, Stanton observed that Plaintiff had full strength throughout her upper extremities. (310) ("Normal bulk and 5/5 strength throughout the

upper extremities.").  Stanton found evidence of mild neuropathy in the left wrist, but no evidence of neuropathy in the right wrist. (Id.)

On September 30, 2008, Matthew Tomaino, M.D. ("Tomaino"), whom Plaintiff was seeing in preparation for surgery on her left shoulder to relieve an impingement, noted: "Her clinical exam continues to demonstrate a painful arc above 90 degrees, but reasonable strength." (309)   In or about January 2009, Tomaino performed decompression surgery on Plaintiff's left shoulder.  On March 20, 2009, Tomaino observed that Plaintiff had better range of movement in the left arm and shoulder: "[S]he is elevating her arm to about 135 degrees and rotating it quite nicely." (345)  Tomaino did not envision that Plaintiff would be permanently disabled to her shoulder: "I am keeping her on total disability, but when she returns in six weeks we may be able to release her to some kind of limited duty." (Id.)  In May 2009, Tomaino observed that Plaintiff was still complaining of pain, that was "a bit out of proportion to where she should be right now." (346)  He further stated:  "Her prognosis is very good.  She just had a minor partial tear and significant bursitis." (347)

On June 5, 2009, Plaintiff was examined by Rajbala Thakur, M.D. ("Thakur") at Strong Hospital Pain Treatment Center. (351-353)  Plaintiff told Thakur that her pain was 9 out of 10. (351)  Thakur performed physical and neurological examinations that were essentially normal, including negative straight leg testing. (352)  Notably, Thakur observed, "the patient appeared to have significant allodyma[4] on every area that was examined.  Mere touch and light palpation was painful over a large body surface area."

---

[4] Presumably he meant allodynia, which is "pain resulting from a stimulus (as a light touch of the skin) which would not normally provoke pain." Merriam Webster Online Medical Dictionary,

(352)  Thakur diagnosed the following as likely:

> 1. Fibromyalgia. 2. Underlying psychiatric comorbidities; 3.Aberrant drug taking behavior. 4. Strong concern for opioid diversion/addiction as the patient's answers about her medication shortage seemed questionable (180 pills in approximately 2 weeks)  She initially insisted that she does not take more than 6 pills/day, then said she needs to take more due to increased pain.  She denied ever taking close to 12/day, [but] that is how much she would take to run out of 180 pills in two weeks.

(353)  Thakur further indicated that Plaintiff "would benefit from a referral to a chemical dependency psychiatrist," though it is unclear whether his report prompted any such referral. (Id.)

On May 12, 2009, Plaintiff was seen by Karl Michalko, M.D. ("Michalko"), an orthopedist.  Plaintiff reportedly gave Michalko the following information: "In 2004 she spent two to three months trying to work as a telemarketer but reports she was unable to tolerate the working [illegible].  She then went to school to be a medical transcriptionist.  She reports she completed that degree but then found the work to be too repetitive and could not perform that." (355).  On June 18, 2009, following surgery for DeQuervain's tenosynovitis, Michalko indicated that Plaintiff would likely be able to return to some type of work: "She does not have a job to return to yet we do anticipate at our next evaluation in 4 to 6 weeks that she would be suitable to return to some form of employment." (360)[5]

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the

---

[5]Michalko had previously indicated, prior to surgery, that in his opinion, the likelihood of Plaintiff being able to return to any "meaningful form of employment" was "quite low." (356).  Michalko did not specify what types of employment he would consider to be meaningful.

Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).  At step five of the five-step analysis above, the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Stating

14

that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.")  However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert ["(VE")](or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[6] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[7]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . .  that opinion will not be deemed controlling.   And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d

---

[6]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. § 416.969a(a). "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a(c).

[7]20 C.F.R. § 416.969(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).  Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of
> a treating physician must consider various 'factors' to determine how
> much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among
> those factors are: (i) the frequency of examination and the length, nature
> and extent of the treatment relationship; (ii) the evidence in support of the
> treating physician's opinion; (iii) the consistency of the opinion with the
> record as a whole; (iv) whether the opinion is from a specialist; and (v)
> other factors brought to the Social Security Administration's attention that
> tend to support or contradict the opinion. *Id*. The regulations also specify
> that the Commissioner 'will always give good reasons in [her] notice of
> determination or decision for the weight [she] give[s] [claimant's] treating
> source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal*,
> 134 F.3d at 503-504 (stating that the Commissioner must provide a
> claimant with "good reasons" for the lack of weight attributed to a treating
> physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Administrative Law Judges are required to evaluate a claimant's credibility

according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms,
> including pain, and the extent to which your symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other
> evidence.  By objective medical evidence, we mean medical signs and
> laboratory findings as defined in § 404.1528 (b) and (c). By other
> evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2)
> through (6) and 404.1513(b) (1), (4), and (5) and (e). These include
> statements or reports from you, your treating or examining physician or
> psychologist, and others about your medical history, diagnosis, prescribed
> treatment, daily activities, efforts to work, and any other evidence showing
> how your impairment(s) and any related symptoms affect your ability to
> work. We will consider all of your statements about your symptoms, such
> as pain, and any description you, your physician, your psychologist, or
> other persons may provide about how the symptoms affect your activities
> of daily living and your ability to work.
> \*\*\*
> In evaluating the intensity and persistence of your symptoms, including
> pain, we will consider all of the available evidence, including your medical
> history, the medical signs and laboratory findings and statements about
> how your symptoms affect you. (Section 404.1527 explains how we
> consider opinions of your treating source and other medical opinions on

the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in

relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

THE HEARING AND ALJ'S DECISION

On March 25, 2008, Plaintiff's representative wrote to the Social Security

Administration in support of Plaintiff's claim and indicated that Plaintiff had the following

limitations:  Able to lift 5-10 pounds, able to sit for sixty minutes at a time, moderately

limited in using hands and pushing/pulling, unable to perform repetitive work with

hands, and unable to use arms above her head. (55-59)   Plaintiff's representative also

appeared to indicate that, in addition to these limitations, Plaintiff was primarily disabled

due to migraine headaches, which caused her to have "all bad days." (57)

On July 23, 2009, a hearing was held before the ALJ.  On August 10, 2009, the

17

ALJ issued the decision that is the subject of this action. (11-18).  At the first step of the

five-step sequential analysis described above, the ALJ found that Plaintiff had not

engaged in substantial gainful employment since December 27, 2006, the application

date. (13)  As discussed further below, though, the ALJ noted that Plaintiff had not

actually engaged in substantial gainful employment since her shoulder injury in 1999.

(13)  At the second step of the analysis, the ALJ found that Plaintiff had the following

severe impairments: "Bilateral Carpal Tunnel, Cerviogenia, Repetitive Motor D/O Rt

upper extremity, rotator cuff tear, Major depression, GERD, asthma, migraines." (13).

At step three of the five-step analysis, the ALJ found that Plaintiff did not have a listed

impairment. (13).  In concluding that Plaintiff's depression did not meet the

requirements for a listed impairment, the ALJ noted that such impairment caused

Plaintiff to have "mild restriction" in her daily activities, with no difficulty in social

functioning, moderate difficulty with regard to concentration, persistence or pace, and

no limitation on attention or concentration. (14).  At step four of the five-step analysis,

the ALJ found that Plaintiff had the residual functional capacity ("RFC")  "to perform the

full range of sedentary work as defined in 20 C.F.R. § 416.967(a)[8] with the following

non-exertional limitations: no more than occasional pushing, pulling, bending, or use of

stairs and claimant should avoid pollen, dust, respiratory irritants, extreme change of

---

[8]This regulation states:

(a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and
occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although
a sedentary job is defined as one which involves sitting, a certain amount of walking and
standing is often necessary in carrying out job duties. Jobs are sedentary if walking and
standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a) (West 2011).

temperature, and extreme humidity." (14).  Significantly, in this regard, the ALJ found

that Plaintiff had no limits on her ability to sit, stand, or walk.  In making this RFC

determination, the ALJ gave "little weight" to the opinions of Williams and Judge, who

are both treating physicians.  On the other hand, the ALJ gave "substantial weight" to

the opinions of Ransom and Sinha, who are consulting physicians who each examined

Plaintiff once.

Moreover, in making this RFC determination the ALJ made certain negative

findings concerning Plaintiff's credibility.  For example, the ALJ suggested several times

that Plaintiff had apparently lied at the hearing concerning the number of children that

she had. (15) ("At the hearing, claimant testified that she has three children ages 7, 9

and 13.  Claimant failed to disclose that she recently had a baby which she cares for at

home."); (16) ("Claimant reported to Dr. Ransom that she . . . spends time with her

three children.  The undersigned finds inconsistency in that claimant's treating physician

notes that she has a baby born on about December 2007 which she cares for[.]"); (17)

(""Dr. Williams' records also reflect that claimant had a baby approximately on

December 1, 2007.  Claimant has omitted this information throughout the remainder of

this record and even testified at the hearing that she had 3 children ages 7, 9 and 13.").

However,  as Defendant now concedes, the ALJ was clearly incorrect on this point,

since Plaintiff testified at the hearing that she had four children:

Q. With whom do you live at the present time?

A. Myself and four children.

Q. How old are the children?

19

A. 15, 11, 9, and 1 years of age.

Q. Do the older children go to school?

A. Yes.

(22).  The  ALJ apparently also seems to have suggested that Plaintiff was being dishonest about her ability to drive a car, and in that regard he wrote: "Claimant testified at the hearing that she has a drivers license but does not drive.  In her function report, claimant states she does drive and travels by driving a car when she goes out." (15).  Plaintiff's two statements, though, are not inconsistent, since, while she did previously indicate that she had a car, at the hearing she testified that she did not drive because she no longer had a car. (28)  Moreover, she was not asked whether she could drive, just whether she did drive.  Therefore, it does not appear that Plaintiff was being misleading concerning her ability to drive.

Based on this residual functional capacity determination, the ALJ found that Plaintiff was able to perform her "past relevant work as a telemarketer." (18).  As noted earlier, Plaintiff had worked briefly as a part-time telemarketer in 2004, but stopped due to her claimed physical limitations.  Nevertheless, because the ALJ found that Plaintiff could perform her past relevant work, he found that she was not disabled, and he therefore did not continue on to the fifth and final step of the sequential analysis.

ANALYSIS

The Court finds that the ALJ's decision contains certain errors which require that this case be remanded for further administrative proceedings.  At the outset, the ALJ erred by finding that Plaintiff could perform her past relevant work as a telemarketer,

because he also found, earlier in his decision, that Plaintiff's work as a telemarketer was not substantial gainful activity.  In that regard, to qualify as "past relevant work," work must qualify as "substantial gainful activity." *See*, 20 C.F.R. § 404.1560(b)(1) ("Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."); *see also, Hignite v. Shalala*, 25 F.3d 1057, 1994 WL 235558 at *1 (10th Cir. Jun. 2, 1994) (unpublished, table) ("Among other requirements, past relevant work must be substantial gainful employment. 20 C.F.R. 416.965(a); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1355 (10th Cir.1987).").[9] Accordingly, on remand, the ALJ must determine whether Plaintiff can perform any of her past work that fits this definition, and that was sedentary.[10]  If not, the ALJ must proceed to step five of the sequential analysis.

The ALJ also made factual errors which affected his credibility determination, as discussed earlier.  Accordingly, on remand, the ALJ must reconsider his credibility determination, in light of Plaintiff's actual testimony. *See, Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010) ("Because the ALJ's adverse credibility finding, which was crucial to his rejection of Genier's claim, was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider "all of the relevant medical and other

---

[9]The boilerplate section of the ALJ's decision recognizes this point. See ALJ's Decision (12) ("[T]he work must have lasted long enough for the claimant to learn to do the job and have been SGA [substantial gainful activity].")  The Court is aware that Plaintiff's representative also incorrectly referred to her telemarketing work as "past relevant work experience." (56)

[10]The ALJ found that Plaintiff was only capable of performing sedentary work.  It does not appear that any of Plaintiff's work prior to her injury was sedentary.

evidence," 20 C.F.R. § 404.1545(a)(3), and cannot stand.").[11]

In addition, the Court finds that on remand the ALJ must develop the record concerning an additional medical source that was identified at the hearing. Specifically, at the hearing Plaintiff indicated that she was seeing a therapist, "Dr. Peter Sullivan," for depression. (35-36)  The record does not contain any information concerning such a therapist,[12] and neither the ALJ nor Plaintiff's representative followed-up on Plaintiff's testimony.  Such failure to develop the record is apparently significant, since the ALJ twice mentioned, in his decision, that Plaintiff had not sought outpatient mental health treatment, and was only "receiving treatment for depression through her primary care physician." (14, 16)  Accordingly, remand is appropriate for the ALJ to develop the record on this point. *See, Atkinson v. Barnhart*, 87 Fed.Appx. 766, 2004 WL 206324 at *3 (2d Cir. Feb. 3, 2004) ("We hold that the ALJ did not adequately fulfill his duty to develop the record in this case. At the hearing, plaintiff clearly indicated that she was being treated at both NYU and St. Luke's. The ALJ sought medical records from St. Luke's from 1991 to the present, but made no similar request to NYU. The gap in the record is particularly glaring because the ALJ based his conclusion that plaintiff did not have a serious mental impairment on the fact that she had "never received psychiatric treatment for her alleged depression" and had "never been prescribed anti-depressant

---

[11]In addition to the matters already discussed, the ALJ remarked on the fact that Plaintiff had apparently told Sinha that she "performs all household activities," and that such evidence is inconsistent with what Plaintiff told her other doctors. (16)  However, inasmuch as these hearings are non-adversarial proceedings, and since Plaintiff has otherwise consistently indicated that she cannot perform such work, the Court believes that the ALJ should have asked Plaintiff about Sinha's report, and given her an opportunity to indicate whether she actually made that statement.  On remand, the ALJ should clarify this point.

[12]The Court observes, however, that, according to the website of the University of Rochester Medical Center, Peter Sullivan, LCSW, is employed there in the field of Outpatient Adult Psychiatry.

22

medication." Yet plaintiff testified at the hearing that she was being treated by a neuropsychiatrist, Dr. Alpo, and that Dr. Alpo prescribed Celexa, an antidepressant. The ALJ should have sought an evaluation and treatment notes from Dr. Alpo before concluding that plaintiff's mental impairment did not significantly affect her work-related abilities.").

Finally, on remand the ALJ should clarify his statement that, "[W]hile claimant appears to have a legitimate impairment, her complaints of pain are not fully credible." (18)  On this point, it appears that Plaintiff's most disabling claimed impairments would be "cerviogenia" and "migraine headaches."  The ALJ apparently accepts that Plaintiff suffers from these conditions, though not to the extent that she claims.  The Court is unclear as to the medical basis for these diagnoses,[13] and why, if Plaintiff in fact has them, the ALJ believes that she is not experiencing the level of pain that she claims.  In this regard, there is no discussion of the possible psychological aspect of Plaintiff's pain that has been suggested by Kuttner (201) and Thakur (353), and how that is analyzed under the Commissioner's regulations.  The ALJ's decision also does not discuss Plaintiff's testimony that she takes three-hour naps most days, because of drowsiness caused by her medications, consisting of pain relievers and muscle relaxers.[14] Presumably, a vocational expert would indicate that someone who must take such naps

---

[13]For example, the Court understands Plaintiff's MRI results to show no abnormality of the cervical spine, and that Pettee's neurologic testing showed normal results.  Nevertheless, Pettee indicated that Plaintiff had "cervicogenic pain [which was] not discogenic in nature." (197)  Moreover, in his statement discussing Plaintiff's cerviogenic and migraine headaches, Williams wrote: "No additional tests are available to  assess pain as this is subjective." (261) The Court is unclear as to whether, in making these diagnoses (cerviogenia and migraine), doctors rely on objective findings, subjective complaints, or both.

[14]Thakur's report suggests that Plaintiff is exceeding her dosage of pain medication, which may factor into this analysis.

would not be able to hold a job.  On remand, the ALJ should address these issues and develop the record further if necessary.

CONCLUSION

Defendant's motion for judgment on the pleadings is denied, Plaintiff's cross-motion for the same relief is granted, and this matter is remanded to the Commissioner for a new hearing consistent with this Decision and Order, pursuant to 42 U.S.C. § 405(g), sentence four.

So Ordered.

Dated: Rochester, New York
        October 28, 2011

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge